

FILED
KENNETH J. MURPHY
CLERK

1992 AUG 19 P 12: 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ARTHUR RAY BOWLING, et al.,

     Plaintiffs,

vs.

PFIZER, INC., et al.,

     Defendants.

Judge ____
Mag. ____
Journal ____
Motion # ____
Issue ____
Card ____
N/S ____
Docketed ____

Case No. C-1-91-256

ORDER FINDING THE
PROPOSED SETTLEMENT
TO BE FAIR

     The matters before the Court include the following items: response by Hearl D. Scales (doc. 60), a letter in opposition to the proposed settlement from Esterina Fabbo (doc. 62), the Interim Memorandum of Completed Notice (doc. 65), a letter from Maya Bisht (doc. 70), letter from Elaine Levenson on behalf of VALV (doc. 114), the Objections by Kasdan & Capretz firm on behalf of Plaintiffs Fedak and Dempster (docs. 133 and 134), the Objections by Kasdan & Capretz on behalf of the Ontario, Canada Ministry of Health (doc. 137), the Objections by Sidkoff, Pincus & Green ("the Green firm") on behalf of the class in Taylor v. Shiley (doc. 143), the Objections by Lewis Saul on behalf of New Zealand residents (doc. 144), a letter by Nancy L. Carr (doc. 147), a letter from Christine Huber (doc. 148), a letter from J. McQueenie (doc. 149), the Objections to the Proposed Settlement by Public Citizen (doc. 151), the Objections by the Dutch Consumentenbond (doc. 154), the First Amended Objections by the Green firm (doc. 159), the Supplemental Appendix by the Green firm (doc. 160), the Class Counsel's Memorandum in Support (doc. 161), the Defendants' Memorandum in Support (doc. 162), the Affidavit of Harvey S. Rosen

250

2

(doc. 163), the letter from Charles Wolfson on behalf of Australian Objectors (doc. 166), the Second Interim Memorandum on Completed Notice (doc. 167), the Affidavit of Sidney Wolfe (doc. 169), the Affidavit of Henry Piehler (doc. 170), the Affidavit of Hans Arndt (doc. 171), the Affidavit of Lawrence Scotten (doc. 172), the Affidavit of David Walker (doc. 173), the Response by Class Counsel to require renotification of New Zealand residents (doc. 178), the Plaintiffs' Response to the Motion to Extend the Opt Out Date and Certify an Australian Sub-Class (doc. 179), the Reply by Kasdan & Capretz (doc. 180), the Affidavit of Hansraj Singh (doc. 181), the Affidavit of Yvette Lemire (doc. 182), the Affidavit of Adrienne S. Fedak (doc. 183), the Objections by Kasdan & Capretz (doc. 184), the Exhibits in Support of Kasdan & Capretz's Objections (docs. 185 and 186), the Motion by Charles Wolfson on behalf of Australian class members (doc. 187), the Objections by the Green firm (doc. 190), the Affidavit of James R. Hales (doc. 193), the Motion by Timothy L. Bouscaren to withdraw (doc. 194), the Defendants' Supplemental Memorandum (doc. 195), the Affidavit of Anthony L. Moulton (doc. 196), the Exhibits of Kasdan & Capretz (doc. 199), a letter form Eric R. Adam (doc. 209), the Reply by the Green firm (doc. 218), the Affidavit of Albert G. Wiemans (doc. 220), the Amended Reply of the Green firm (doc. 221), a letter to the Court form Eric R. Adam (doc. 222), Class Counsel's response to the Green firm's Amended Reply (doc. 223), the Defendants' Second Supplemental Memorandum (doc. 225), the Defendants' Response to the Court's Order (doc. 226), the Green firm's Response (doc. 227), the

Green firm's Reply (doc. 228), the Green firm's Motion to Compel Discovery (doc. 229), the Green firm's Motion to substitute Elliot Polaniecki in place of Timothy L. Bouscaren (doc. 230), Class Counsel's Response to the Court's Order (doc. 231), several letters objecting to the proposed settlement (doc. 232), Class Counsel's Response to Charles Riffe, II (doc. 233), the Summary of the Proposed Settlement (doc. 234), the Green firm's Reply (doc. 235), and the Defendants' Response to the July 20, 1992 filing by the Green firm (doc. 237), the Request by Plaintiffs' counsel to withdraw the motion for the Australian sub-class (doc. 239), the Defendants' Response to the Motion to Compel (doc. 244), the Supplemented Agreement of Compromise and Settlement (doc. 245), the Response by Class Counsel for the Green firm's Request for Discovery (doc. 248), and the Response by Class Counsel to the Green firm's Request for a Protective Order (doc. 249).[1]

Furthermore, the Court held a fairness hearing regarding the proposed settlement on June 5, 8, 9, 1992 and July 22, 1992. As a result of certain concerns expressed by the Court, the proponents of the proposed settlement have made several sets of alterations to the proposed settlement. In issuing this Order, the Court has considered the matters covered at the fairness hearing as well as

---

[1] Based upon the representations made by Class Counsel and the Defendants, the Court understands that the following attorneys have withdrawn their objections to the proposed settlement: Kasdan & Capretz, Lewis Saul, Charles Wolfson, and Brian Magana. The Court has been told that these attorneys have withdrawn their opposition to the proposed settlement because the Defendants and Class Counsel have modified the proposed settlement to reflect many of the objections originally stated by these attorneys.

4

reviewing the items filed with the Court. In sum, the issue before this Court is whether the proposed settlement is fair, adequate, and reasonable. Jt. ex. 2 (July 22, 1992 Fairness Hearing). For the reasons set forth below, we conclude that the proposed settlement is indeed fair, adequate, and reasonable.

## PRELIMINARY MATTERS

Before we consider whether the proposed settlement is fair, adequate, and reasonable, we must first deal with several preliminary matters.

The local counsel for the Green firm, Timothy L. Bouscaren, has moved to withdraw. Timothy L. Bouscaren's application to resign as local counsel for the Pennsylvania class is granted in light of the fact that Elliot Polaniecki submitted an application to be substituted as local counsel for the Green firm. Consequently, Mr. Polaniecki's motion to be substituted as local counsel is granted.

Janet E. Metzger moved for an extension of time to opt out of the class on behalf the estate of Donald R. Metzger. The Court understands that the Defendants and Class Counsel do not oppose Mr. Metzger's motion for an extension of time to opt out. Donald R. Metzger died on April 12, 1992. Because an administrator of Donald Metzger's estate had not been appointed, no one could exercise Mr. Metzger's right to opt out of the proposed settlement in time. Therefore, the Court grants the motion of Janet E. Metzger in light

of these unusual circumstances. However, this decision should not be interpreted as precedent for the extension of the opt out date for other class members in the absence of similar circumstances.

We now consider several discovery matters. The Green firm has moved to compel the proponents of the settlement to provide discovery. In response, Class Counsel has moved for a protective order against such discovery. Objectors may discover the details of a class counsel's negotiations with the defendants only where the objectors lay a foundation by adducing from independent sources of evidence that the settlement may be collusive. Mars Steel Corp. v. Continental Ill. Nat'l Bank and Trust, 834 F.2d 677, 684 (7th Cir. 1987). This Court has already affirmed Magistrate Judge Jack Sherman, Jr.'s finding that no evidence of collusion existed between the Defendants and Mr. Chesley, Class Counsel, as of May 19, 1992. Therefore, the Objectors must furnish additional independent evidence of collusion before it is reasonable for this Court to compel the proponents of the settlement to furnish discovery material concerning the negotiations of the settlement.

In its latest attempt to argue that this Court should reverse its previous decision and allow discovery of settlement negotiations, the Green firm does not address the Mars Steel decision and the other cases which support this Court's May 19, 1992 decision. Rather, the Green Firm alludes to the existence of "additional facts" that support charges of collusion. However, the principal source of those additional facts is the transcript of the November 19, 1991 status conference with which this Court is

6

obviously familiar. We conclude that the Green firm has failed to provide any independent evidence of collusion.

The Green firm also asserts that the Defendants' responses to interrogatories and document requests are incomplete. The Court finds that the defendants' answers and objections are adequate and consistent with the Court's previous Orders concerning what is discoverable in this case. Therefore, this Court denies the Green firm's motion to compel the proponents of the settlement to provide discovery and grants Class Counsel's motion for a protective order.

Furthermore, as has already been accomplished at the fairness hearing, the Court grants the Green firm's motion to be heard at the fairness hearing and denies the Green firm's motion to cross-examine the proponents of the proposed settlement at the fairness hearing.

Finally, in response to a certain amount of confusion, all documents filed with this Court in this case are now unsealed.[2]

## THE HISTORY OF THIS LITIGATION

Before discussing the litigation and proposed settlement, we should first briefly note the context in which this litigation arises. From 1979 to 1986, Shiley, a wholly-owned subsidiary of Pfizer, produced thousands of Bjork-Shiley convexo/concave heart valves. Somewhere between 50,000 and 100,000 of these valves were

---

[2] Of course, items given to the Court in camera will remain confidential.

7

implanted in patients from all over the world.[3] It is now thought that about 450 of these heart valves have fractured, resulting in approximately 300 fatalities. Critics of Pfizer-Shiley have alleged that Bjork-Shiley convexo/concave heart valves have a tendency to fracture because of design and manufacturing defects. Pfizer-Shiley denies any design or manufacturing defects and claims that its heart valves are not any more likely to fracture than other heart valves available on the market.

Pfizer, and its subsidiary Shiley, have been sued in many different courts over matters concerning the Bjork-Shiley convexo/concave heart valve. In all litigation where the Shiley heart valve has indeed fractured, the Defendants have represented to this Court that the parties have settled the litigation, subject to a confidentiality agreement. In cases where the Shiley heart valve has not fractured, at least twenty-seven courts have granted summary judgment to the Defendants on the ground that a plaintiff may not recover for her fear or anxiety that a heart valve may fracture in the future. See e.g., Pryor v. Shiley, Inc., No. 89-35549 (9th Cir. Oct. 18, 1990); Hagepanos v. Shiley, Inc., No. 87-3141 (4th Cir. April 18, 1988); Sill v. Shiley, Inc., 735 F. Supp. 337 (W.D. Mo. 1989), aff'd, 909 F.2d 508 (8th Cir. 1990); Brinkman v. Shiley, Inc., 732 F. Supp. 33 (M.D. Pa. 1989), aff'd, 902 F.2d 1558 (3d Cir. 1989).[4]

---

[3]   Class Counsel and the Defendants believes that the number of implantees approximately equals 55,000.

[4]   These matters will be discussed in more detail later in this Order.

8

Still, Pfizer-Shiley has ample reason to try to settle all claims involving the Bjork-Shiley convexo/concave heart valve. One California court allowed the plaintiff with a properly functioning heart valve past the summary judgment stage of litigation, based upon a fraud theory. Khan v. Shiley, Inc., 217 Cal. App. 3d 848, 266 Cal. Rptr. 106 (4th Dist. 1990), review denied (May 3, 1990). Moreover, the Defendants have had to defend numerous lawsuits involving the Bjork-Shiley convexo/concave heart valve since the mid-1980's. These lawsuits have caused Pfizer to not only bear legal costs, but also they have diverted the attention of many of its employees away from their usual jobs to deal with litigation. In addition, the presence of pending litigation, with large sums of compensatory and punitive damages demanded, could jeopardize Pfizer's ability to attract investment. Defendant's Memorandum in Support of the Proposed Settlement, doc. 162, attachment 10, Opinion of Professor David Rosenberg, at 8.

Furthermore, Pfizer and Shiley have been the subject of an increasing number of critical news stories and reports. The Wall St. Journal, for instance, noted that "[t]he mounting toll [of fracturing valves] has triggered sharp criticism of the [Pfizer] company at congressional hearings and in the media. Allegations have included sloppy manufacturing and failure to fully inform the Food and Drug Administration . . . ." William M. Carley, Artificial Heart Valves that Fail are Linked to Falsified Records, **Wall St. J.**, Nov. 7, 1991, at A1.

9

With this background in mind, we now turn our attention to the case now before this Court. The genesis of this case has Kentucky roots. On March 28, 1991, the named Plaintiffs in this litigation brought an action against Pfizer and Shiley in the United States District Court for the Eastern District of Kentucky. <u>Wright v. Pfizer</u>, Case No. 91-58 (E.D. Ky. March 18, 1991). Three weeks later, the Plaintiffs voluntarily dismissed the litigation pending in Kentucky and brought substantially the same claims in this Court, along with several other Plaintiffs from Ohio.[5]

In their Complaint, the Plaintiffs causes of action included negligence, strict liability, negligent misrepresentation, fraudulent misrepresentation, intentional infliction of emotional distress, and negligent infliction of emotional distress. The Plaintiffs sought compensatory damages, medical monitoring, punitive damages, and other various forms of relief. The Plaintiffs proposed a class action under Fed. R. Civ. P. 23. All of the named Plaintiffs had properly functioning Bjork-Shiley convexo/concave heart valves manufactured by the Defendants Pfizer-Shiley.

In response to these allegations, the Defendants filed Motions for Summary Judgment and a Motion to Dismiss against the Plaintiffs. Among other arguments, the Defendants contended that the law forbade any recovery for the emotional distress over the fear that a properly working product might malfunction. The

---

[5] Mr. Chesley explained that the lawsuit was moved to Ohio once he began representing plaintiffs residing in Ohio.

10

Plaintiffs filed a lengthy response to the Defendants' motion for summary judgment, to which the Defendants' replied. Having been apprised by the parties that they were involved in settlement negotiations, the Court delayed in ruling upon the Defendants' motions. Subsequently, the Court denied the Defendants request to hear the motions for summary judgment and the motion to dismiss together with the Plaintiffs' request for class certification.

On November 19, 1991, the Court held a status conference on the case. At this status conference, the parties apprised the Court that they were close to settling this matter as a class action. Approximately two months later, the parties informed the Court that they had agreed upon a proposed settlement. The Court granted the parties' Joint Motion for Conditional Class Certification for Settlement Purposes, (doc. 43) and set a fairness hearing to begin in June 1992. Thus, this Court never ruled on the Defendants Motions for Summary Judgment and Motion to Dismiss.


## THE PROPOSED SETTLEMENT


The proposed settlement to this litigation is extremely complex. For any readers of this Order who are unfamiliar with the proposed settlement, the following is the summary of the proposed settlement which the parties have submitted to this Court:

> The settlement offers benefits to class members who have the C/C artificial valves and their spouses from funds totalling from $165 million to $215 million, as

11

well as certain other payments without any monetary
limit.

All protocols and procedures established to
administer programs and benefits are subject to Court
approval. All payments to class members shall be made
by Court appointed masters or trustees. All payments to
be made by Shiley are guaranteed by Pfizer.

I. The Patient Benefit Fund

A. General

1. A fund of $75 million will be
established. This fund will be
established through annual payments
as follows: (a) Shiley will deposit
$12.5 million with the Court within
30 days of final approval of the
proposed settlement; (b) beginning
on the second anniversary of final
approval of the settlement Shiley
will make annual deposits into the
fund of not less than $6.25 Million;
and (c) if the required benefits at
any time exceed the amount available
in the fund, then Pfizer will
accelerate its payments into the
fund so that benefits may be paid in
a timely manner.

B. Research and Development

1. The fund will pay for (a) research to
develop diagnostic techniques to identify
valve recipients who may have a significant
fracture risk, and (b) research to
characterize or reduce the risk of valve
replacement surgery.

2. The fund will pay for certain expenses
incurred by class members for diagnostic
testing services to identify recipients who
have a significant risk of fracture when the
diagnostic techniques are developed and
approved or accepted by the FDA.

3. The Supervisory Panel will allocate
research funds, administer the testing program
and select entities to perform research
services.

12

C. Replacement Surgery[6]

1. Payments will be made from the $75 million fund for valve replacement surgery which qualifies under guidelines established by the Supervisory Panel.

2. Even if the $75 million is exhausted, Pfizer will remain obligated to continue to pay benefits for qualifying valve replacement surgery.

3. Replacement surgery payments are as follows:

(a) surgical and related medical expenses not covered by insurance or government benefits ("outside benefits"); (b) $38,000 lump sum to cover all miscellaneous costs and expenses relating to and following hospitalization (including travel and lodging expenses; care of family during hospitalization and recuperation; post-operative home care; miscellaneous other economic loss; etc.); (c) lost income not covered by outside benefits, up to $1,500 per week for up to one year; (d) benefits for partial disability in excess of one year; (e) benefits for permanent disability or death on the same basis as fracture.

D. Supervisory Panel

1. A seven member Supervisory panel shall be selected by the parties, subject to Court approval. The members may not have ties to defendants or have participated in any C/C heart valve litigation. Six of the members shall be qualified experts and the seventh members shall be neither a scientist nor a physician. The duties of the Supervisory Panel are discussed above.

II. The Medical Consultation Fund

---

[6] The Court has referred to replacement surgery also as valve replacement surgery, explant surgery, and explantation.

13

A. A fund has been established in the amount of $80 million, which may increase to as much as $130 million depending upon the number of class members who wish to participate.  The payments are intended to provide funds for class members to obtain medical or psychological consultation.  There is, however, no restriction on the use of the money.

B. The fund shall provide an equal cash payment to each valve recipient who makes a claim against the fund. The amount paid to each claimant will be greater than $4,000 if more than 20,000 class members respond.  In the unlikely event that all of the currently estimated 50,000 valve recipients make a claim against the fund, the minimum payment would be approximately $2,500.

C. In addition, a fund of $10 million will be established to be divided equally among all claimants who are spouses of class members with C\C valves.  The amount of the payment to each spouse will depend upon the number of spouses who make claims.

III. Fracture Compensation

A. General

The settlement provides an optional guaranteed compensation program, which serves as a kind of insurance in the unlikely event of valve fracture.  In the event of a fracture, claimants are guaranteed an immediate cash payment in an amount to be determined based on formulas. This program offers prompt settlement for valve fractures.  Alternatively, the fracture claimant may opt for binding arbitration to determine fair compensatory damages, in which arbitration, defendants waive all defenses to liability.  Fracture claimants also may reject both expedited procedures and sue for compensatory and punitive damages from the fracture, in which case defendants retain all defenses.

B. Fracture Compensation Formula

For United States residents, a formula has been developed which reflects the claimant's family status, age and income, and provides a minimum payment of $500,000 and a maximum payment of $2 million.  Formulas for non-U.S. residents will be developed by an expert panel approved by the Court.  Defendants will provide a minimum payment of $200,000 to claimants who are, at the time of the fracture residents of countries in Groups I or II, and a minimum payment of $50,000 to claimants who are residents of countries in Groups III or IV, even if

14

the formulas developed by the expert panel would result in a lower amount.

IV.   Rights Retained by Class Members

A. Class members retain the right to sue for damages from valve replacement surgery if they do not qualify for valve replacement surgery payments under the Supervisory Panel guidelines, or if they opt to waive the payments in favor of bringing a lawsuit.

B. Class members whose valve replacement surgery would qualify under the guidelines but who do not undergo surgery and have not received any fracture compensation under the settlement may bring an action for damages for alleged emotional distress from fear of fracture of a working valve. Bringing such an action waives all future rights under the settlement.

C. Fracture claimants who do not claim benefits for fracture may bring suit for fracture.

D. Class members settle all claims other than claims for benefits provided under this Agreement, claims alleging injury due to an actual in-vivo malfunction of the claimant's valve and those set forth in (A), (B) and (C) above. Claims for emotional distress relating to fear of fracture of a working valve are settled.

Doc. 234.

## STANDARD OF REVIEW

The task of this Court is to review the proposed settlement, because a class may settle its claims only with the Court's approval. Fed. R. Civ. P. 23(e). This Court has conducted a fairness hearing in an effort to determine whether the proposed class settlement is ". . . fair, adequate, and reasonable. . . ." Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO, 803 F.2d 878, 880 (6th Cir. 1986), cert. denied sub nom.,

Jones v. Clark Equip. Co., 480 U.S. 934 (1987) (quoting Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615 (9th Cir. 1982), cert. denied, Byrd v. Civil Serv. Comm'n, 459 U.S. 1217 (1983)); Bronson v. Bd. of Educ. of the City Sch. Dist. of Cincinnati, 604 F.Supp 68, 71 (S.D. Ohio 1984). This Court, as the trial court, has discretion in determining the fairness of the proposed plan. Laskey v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am., 638 F.2d 954, 957 (6th Cir. 1981).

Despite the fact that this Court has discretion, "[t]he Courts' role in evaluating a private consensual agreement 'must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" Clark Equip., 803 F.2d at 880 (quoting Officers For Justice, 688 F.2d at 625 (9th Cir. 1982)). As a result, the Court has the power to take only three actions when faced with a proposed settlement to a class action: (1) to approve the proposed settlement in whole; (2) to reject the proposed settlement without recommendations for modification; and (3) to reject the proposed settlement, but with suggestions and recommended changes. Bronson, 604 F.Supp at 73.

The burden of proving the fairness of the settlement rests with the proponents. However, an initial presumption of fairness exists if the settlement is recommended by class counsel after arms-length bargaining. Herbert B. Newberg, 2 Newberg on Class

16

Actions § 11.41 at 453 (2d ed. 1985). We, nevertheless, must keep in mind that in the context of a settlement agreement, both Class Counsel and the Defendants have proposed a compromise of the controversy, and accordingly both are interested in obtaining the Court's approval. Moreover, when a settlement to a class action is reached prior to class certification, a court must apply a higher level of scrutiny in evaluating the fairness of the settlement. Mars Steel v. Continental Ill. Nat'l Bank & Trust, 834 F.2d 677, 681 (7th Cir. 1987); Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982), cert. denied, Lewy v. Weinberger, 464 U.S. 818 (1983).

This Court must consider certain factors when it determines whether the proposed settlement is fair, adequate, and reasonable. First, we must compare the strength of the plaintiff's case with the amount and form of relief offered by the settlement. Carson v. Am. Brands, 450 U.S. 79, 88 n.14 (1981) (commenting on how courts judge the fairness of a compromise); Williams v. Vukovich, 720 F.2d 909, 922 (6th Cir. 1983); Bronson, 604 F.Supp. at 73. Second, the Court should search for the presence of collusion. Id; Stotts v. Memphis Fire Dep't, 679 F.2d 541 (6th Cir.), rev'd on other grounds, 467 U.S. 561 (1984) (court can approve a settlement only after it determines that the settlement is the result of good faith, arms-length negotiations). Third, the Court must consider carefully any objections raised by class members. Id. Fourth, the

17

Court should analyze the amount and nature of discovery.[7]  Id.
These factors must all be considered as a whole to determine
whether a proposed settlement is fair, adequate, and reasonable.

## THE OBJECTIONS TO THE PROPOSED SETTLEMENT

Cognizant of the standard of review, we now turn to the
objections to the proposed settlement. The two principle objectors
are the Green firm and Public Citizen. In addition, several other
people have written letters to the Court expressing dissatisfaction
with the proposed settlement. Others have objected at the fairness
hearing.    The objections stated in these letters and at the
fairness hearing are contained in the objections filed by the Green
firm and by Public Citizen. Therefore, we have not dealt with the
objections stated in those letters and at the fairness hearing
directly, but rather we have considered these objections in our
discussion of the objections by the Green firm and Public Citizen.

---

[7]    When significant discovery has been completed, the Court
should defer to the judgment of experienced trial counsel who has
evaluated the strength of his case.    Bronson, 604 F.Supp. at 73;
Williams, 720 F.2d at 922-923.  Because significant discovery has
not been completed in the case now before the Court, this rule of
law is not applicable.

18

The Green Firm's Objections

**1. The Objection that Class Counsel and the Defendants Colluded to Form the Proposed Settlement**

The Green firm's first argument is that the proposed settlement of this litigation is the product of collusion between Class Counsel, Mr. Chesley, and the Defendants, Pfizer-Shiley.[8]

The possibility of collusion exists in class actions. A defendant has an interest in minimizing its liability; class counsel has an interest in his attorney's fee. See John C. Coffee, Jr., The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877, 883-89 (Summer 1987) (noting that substantial conflicts of interest can arise in class actions, with the possibility of "sweetheart settlements" arising for the benefit of the defendant and class counsel). In order to protect against collusion, the Federal Rules of Civil Procedure require a court to determine that a proposed settlement of a class action is fair, adequate, and reasonable before the proposed settlement can be implemented. See Fed. R. Civ. P. 23(e).

---

[8] This Court has read with particular care the filings by the Objectors to the proposed settlement. This Court has tried to identify the Green firm's major arguments from their lengthy, rambling filings with the Court.

It has become apparent to this Court that the Green firm has become emotionally involved in this litigation. We sympathize with the Green firm, which has invested thousands of hours into heart valve litigation apparently without success.

19

In determining whether class counsel and a defendant have engaged in collusion, courts have essentially engaged in what can be described as the "proof is in the eating" test. In essence, under this test, if the terms of the proposed settlement are fair, then the court may assume the negotiations were proper. <u>In re Corrugated Antitrust Litig.</u>, 643 F.2d 195, 212 (5th Cir. 1981), <u>cert. denied</u>, 456 U.S. 998 (1982). Thus, the United States Court of Appeals for the Fifth Circuit concluded that:

> [i]t is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting. If the terms themselves are fair, reasonable, and adequate, the district court may fairly assume that they were negotiated by competent and adequate counsel; in such cases, whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance.

<u>Id.</u>

Similarly, the United States Court of Appeals for the Seventh Circuit in approving a class action settlement, noted that "[r]ather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation . . . . The proof of the pudding was indeed in the eating." <u>Mars Steel v. Continental Ill. Nat'l Bank & Trust Co.</u>, 843 F.2d 677, 684 (7th Cir. 1987); <u>see also In re Agent Orange Prod. Liab. Litig.</u>, 597 F. Supp. 740, 762 (E.D.N.Y. 1985), <u>aff'd in part, rev'd in part on other grounds</u>, 818 F.2d 226 (2d Cir. 1987) (most important concern for the court in reviewing a settlement of a class action is the strength of the plaintiffs'

20

case if it were fully litigated); Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982), cert. denied, Lewy v. Weinberger, 464 U.S. 818 (1983) (". . . primary concern [for the court] is with the substantive terms of the settlement . . . .").

As discussed later in this Order, this Court finds that the substantive terms of the proposed settlement are fair, adequate, and reasonable. Therefore, we find no collusion. Even the Green firm has found merit in the proposed settlement. The Green firm argues that the proposed settlement was "stolen" from its proposal to settle the Green firm's case of Taylor v. Shiley, Case No. 2087 (Ct. Common Pleas Pa.). Taylor v. Shiley is a state court class action pending in Pennsylvania. Assuming this assertion to be true, the Green firm cannot now claim that the proposed settlement in Bowling v. Pfizer is unreasonable, as the Green firm evidently once stood as proponents of just such a settlement.[9] Thus, in applying the "proof is in the eating" test, the proposed settlement in Bowling v. Pfizer is fair, adequate, and reasonable to class members.

_____

[9] In fairness to the Green firm, it points out that:

> . . . the draft proposal submitted by counsel in Taylor v. Shiley did not have numbers inserted, and there were certain additional details which would make a crucial difference in improving the settlement Mr. Chesley accepted, but in substance the provisions of the two settlement proposals are distinctly similar.

Objections of Plaintiffs and the Class in Taylor v. Shiley, doc. 143, at 9.

However, out of an abundance of caution, this Court has searched for, but not found any evidence that the parties engaged in collusion.[10] First, we should briefly examine the history of this litigation. We know that no representative of the Defendants communicated with Mr. Chesley or his firm concerning heart valve litigation prior to the initiation of Mr. Chesley's lawsuit against Pfizer. Defendants' Response to Interrogatories, Interrogatories 1 and 2 (Attached as Ex. 5 to Defendants' Second Supplemental Memorandum, doc. 225). In the relatively brief period prior to settlement, this matter was actively litigated. Both sides of the litigation were conducting discovery. Mr. Chesley opposed the Defendants' Motions for Summary Judgment and Motion to Dismiss. Two months after commencing this action, Mr. Chesley moved for class certification. Furthermore, Mr. Chesley convinced this Court that it should hear the motion for class certification prior to considering the Defendants' dispositive motions. While this Court never ruled on the Defendants' pending motions, these facts indicate that there was no collusion between Mr. Chesley and the Defendants. If Mr. Chesley and Pfizer-Shiley were engaged in collusion, then it would be of little importance to either party

---

[10] Moreover, Magistrate-Judge Jack Sherman, Jr. denied several Objectors' Motion to Compel certain discovery from Class Counsel and the Defendants. After a lengthy hearing, the Magistrate-Judge stated that there was ". . . no evidence from any source indicating that the settlement may be collusive." Transcript of Proceedings, May 11, 1992, at 3. This Court has already affirmed the Magistrate-Judge's determination to deny the motion to compel.

whether the Court considered the Motions for Summary Judgment or the Motion to Certify first.[11]

Nevertheless, the Green firm makes the conclusory allegation that the proposed settlement is a product of collusion. We now examine the Green firm's support for its allegation. First, the Green firm essentially contends that because Mr. Chesley, Class Counsel, and Mr. Feinberg, attorney for the Defendants, had a friendly relationship, they engaged in collusion. Mr. Chesley and Mr. Feinberg agree that they have had a long relationship together stretching back to the Agent Orange litigation. We fail to see how this fact is at all indicative of collusion, especially in light of the relatively small number of lawyers practicing in Mr. Chesley's and Mr. Feinberg's field of mass torts.

The Green firm then states that "[t]he records of the Agent Orange litigation show that many of the attorneys representing class members and on the plaintiffs' class committee were not quite as agreeable to Mr. Feinberg's suggestions as Mr. Chesley." Objections of the Plaintiffs and the Class in Taylor v. Shiley, doc. 143, at 9. The Green firm provides absolutely no documentation for this aspersion, and therefore we give little credence to it.

---

[11] Of course, the Green firm might argue that all the motions filed with this Court were merely a ruse to beguile the Court into believing that the negotiations to the proposed settlement were at arms-length. If Mr. Chesley's and the Defendants' plans were so deeply immersed in this level of subterfuge, however, then surely the two parties would have conducted more than just nominal discovery in an effort to truly deceive the Court.

23

Next, the Green firm points out that Mr. Feinberg only became involved with heart valve litigation to settle the <u>Bowling v. Pfizer</u> case with his "friend," Mr. Chesley. Again, we do not find this surprising. Mr. Feinberg has a long history of involvement with class actions and mass torts, and thus could draw upon his experience to try to globally resolve the series of lawsuits with which Pfizer has been faced. These facts in no way indicate that the parties were acting collusively.

The Green firm's next argument is that the settlement was completely negotiated prior to the November 19, 1991 conference with the Court. We do not believe that this assertion is accurate; however, even assuming it to be true, we once again do not find that this is indicative of collusion. Merely because a settlement is negotiated in a month or two does not mean that the settlement is collusive. We refuse to impose some sort of artificial minimum amount of time for negotiations, before a settlement may be approved. Instead, we hold that several months constituted sufficient time for the parties to enter into a non-collusive proposed settlement.

The Green firm further asserts that because the proposed settlement was world-wide and involved 70-degree valves, that the settlement was collusive. Merely because the parties settled a greater dispute than Mr. Chesley originally envisioned does not indicate that the parties engaged in collusion. Courts have encouraged the settlement of lawsuits, particularly class actions. <u>Bennett v. Behring</u>, 737 F.2d 982, 986 (11th Cir. 1984); <u>Weinberger</u>

24

v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982), cert. denied, Lewy v. Weinberger, 464 U.S. 818 (1983); Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). In line with this policy, this Court promotes sweeping settlements of disputes. By reducing and spreading the costs of litigating numerous claims, class settlements maximize the benefits from the compensation of injuries and the deterrence of the infliction of such injuries.[12] See David Rosenberg, Class Actions for Mass Torts: Doing Individual Justice by Collective Means, 62 Ind. L.J. 561 (1987) (elaborating upon the advantages to mass tort settlements).

We assert that it would be against sound public policy to discourage far-reaching settlements. If, for instance, the proposed settlement in this case were limited to United States citizens, the likely result would be that the Research Fund would be directed towards American implantees and not foreign implantees. We believe that if the proposed settlement is indeed advantageous to implantees, then it should be far-reaching.[13] Thus, we reject

---

[12] This advantage is particularly apparent in the proposed settlement in Bowling v. Pfizer, because class members had the right to opt out of the proposed settlement if they did not find it to be advantageous.

[13] The Green firm queries: "[i]s it not collusion for Pfizer and Mr. Chesley to agree to enlarge the class from approximately 40,000 to 90,000 or more? Is it not collusion for Pfizer to agree to have an additional 50,000 people sue it?." Objections of Plaintiffs and the Class in Taylor v. Shiley, doc. 143, at 13. The Green firm simply ignores the fact that the Defendants might yen for peace from the numerous lawsuits that Pfizer-Shiley has coped with since the mid-1980's.
In fact, the Federal Rules of Civil Procedure allow a defendant to move for the certification of a class action. Fed. R. Civ. P. 23. Rule 23 was designed for the benefit of both plaintiffs and defendants, in light of the problems associated with

25

the Green firm's argument that because the settlement was expanded, that it must have been collusive.

The Green firm further contends that Pfizer-Shiley did not dispute Mr. Chesley's lawsuit as vigorously as it did other lawsuits. This Court has no concrete way of deciphering the vigor with which Pfizer has defended one lawsuit in comparison to another. We do know that prior to settlement in <u>Bowling v. Pfizer</u> the Defendants filed lengthy Motions for Summary Judgment and a Motion to Dismiss.

Furthermore, to the best of this Court's knowledge, the lawsuit in <u>Bowling v. Pfizer</u> differed from other lawsuits that were pending around the country.[14] Mr. Chesley filed a nationwide class action lawsuit in <u>Bowling v. Pfizer</u>, which was subsequently amended to become a worldwide class action. Thus, in <u>Bowling v. Pfizer</u> the Defendants appear to have seized the moment to settle virtually all the pending claims against it involving the Bjork-Shiley convexo/concave heart valve. <u>See</u> David Crump, <u>What Really Happens During Class Certification? A Primer for the First-Time Defense Attorney</u>, 10 **Rev. Litig.** 1 (Fall 1990) (recognizing that to an

---

litigating numerous suits, as opposed to the efficiency of adjudicating one over-all action. <u>See</u> David Crump, <u>What Really Happens During Class Certification? A Primer for the First-Time Defense Attorney</u>, 10 **Rev. Litig.** 1 (Fall 1990). Thus, merely because both parties desired a class action does not mean that they were acting collusively.

[14] We know of one other case in which a plaintiff attempted to form a nationwide class action against Pfizer-Shiley concerning the Bjork-Shiley convexo/concave heart valve. In <u>Mehornay v. Shiley, Inc.</u>, Case No. CV-91-101-HLH (C.D. Cal. June 3, 1991), the court denied the motion to certify a class.

26

increasing extent, defendants actively encourage class certification, particularly when there are numerous potential claims and the desire for corporate peace). In other pending lawsuits, Pfizer-Shiley could settle only the claims of a relative few number of people implanted with the Bjork-Shiley convexo/concave heart valve.

Moreover, in Bowling v. Pfizer the Defendants had an adversary in Mr. Chesley, an experienced litigator in mass torts, who had brought suit in this Court, where he had before fought class action suits involving emotional distress. See David Day v. NLO, Inc., Case No. C-1-90-67 (S.D. Ohio) (J. Spiegel); In re Fernald Litig., Case No. C-1-85-149) (S.D. Ohio) (J. Spiegel). Thus, based upon the opportunity for corporate peace and the prospect of a litigation class spearheaded by Mr. Chesley, Pfizer-Shiley opted to try to negotiate a virtual end to the litigation that had been plaguing it for several years.

In comparison, in Taylor v. Shiley, the pending case the Green firm is litigating, Pfizer-Shiley faced a completely different situation. In Taylor v. Shiley, the Green firm has been attempting to pursue a class action in Pennsylvania state court against Pfizer-Shiley on behalf of Pennsylvania implantees. Thus, if the Defendants were to settle the claims in Taylor v. Shiley, there would be little peace from litigation for Pfizer-Shiley. In addition, the Green firm has not informed this Court as to the experience it has in litigating mass torts. Consequently, this Court finds that the Defendants decision to settle Bowling v.

Pfizer with Mr. Chesley is not indicative of collusion, but rather of sound business judgment.

The Green firm continues its collusion argument by stating that Mr. Chesley conceded the class' right to punitive damages in the proposed settlement. In exchange for any right the class had to punitive damages, Mr. Chesley gained the Defendants' agreement to waive its defenses of the statutes of limitation and the statutes of repose. As discussed later, we do not find that this bargain is indicative of collusion, in light of the Plaintiffs' poor prospects of successfully litigating a case involving a properly functioning heart valve, let alone recovering punitive damages.

The Green firm's next argument is that Mr. Chesley and Pfizer-Shiley failed to keep other lawyers informed about their negotiations in order conceal their collusion. However, as discussed below, Mr. Chesley was under no obligation to keep the Green firm, or any other lawyers, apprised of the sensitive negotiations he was conducting with Pfizer-Shiley to settle his lawsuit.

Thus, we conclude not only upon the "taste is in the eating" test, but also upon the record that Class Counsel and the Defendants did not engage in collusion to arrive at the proposed settlement.

28

**2. The Objection that the Proposed Settlement is Replete with Procedural Improprieties**

The Green firm's next set of objections involves alleged procedural improprieties. The first of these is that Objectors to the proposed settlement were improperly required to opt out before the fairness hearing. We have considered this issue before. In our May 19, 1992 Order, we denied a motion to extend the opt out date. Doc. 123, at 4, 5. Based upon the reasons cited in this Court's previous Order, we reaffirm our holding that having the opt out date prior to the fairness hearing was not prejudicial to class members.

The Green firm continues by arguing that it was denied due process by having to decide whether to opt out and lose its standing to object, or to stay in the proposed settlement and have standing to object. At a conference prior to the fairness hearing, the Court informed conference participants, including the Green firm, that this Court wished to hear from all persons wishing to speak regarding the proposed settlement. At the fairness hearing, this Court carried through with that policy, allowing amicus curiae Objectors, and others, to raise objections to the proposed settlement. We, therefore, hold that the Green firm has not been denied due process. As far as this Court is concerned, the Green firm was free to have opted its clients out, and then could have voiced its objections to the proposed settlement at the fairness hearing.

The Green firm next contends that this Court improperly sealed the November 19, 1991 conference with the Defendants' attorneys and Mr. Chesley. While we agree that most court documents are to remain open, this Court has discretion as to which documents are to be sealed. Nixon v. Warner Communications, Inc., 435 U.S. 589, 598 (1977) ("[e]very court has supervisory power over its own records and files. . . "); Meyer Goldberg, Inc. v. Fisher Foods, Inc., 823 F.2d 159, 161 (6th Cir. 1987) (appellate review of the district court's decision to deny a request to lift or modify a seal is based on an abuse of discretion standard); Huntsman-Christensen Corp. v. Entrada Indus., Inc., 639 F. Supp. 733, 735-736 (D. Utah 1986) (courts have supervisory powers over their own files and records, and have discretion to seal court documents if the public's right to access is outweighed by competing interests).

This Court sealed the November 19, 1991 conference because news of the settlement negotiations might have had ramifications on Pfizer's publicly traded stock. In light of Pfizer's concern about fluctuations in its stock price, we agreed to seal the transcript. Subsequently, when objectors asked to see the transcript, Magistrate-Sherman allowed these objectors to see the transcript subject to a Protective Order. Eventually, this Court unsealed the transcript because the concerns about Pfizer's stock price were no longer applicable. In sum, we find the Green firm's arguments regarding the sealing of court documents to be specious.

The Green firm further contends that it was procedurally unfair to require the objectors to file their objections before

they had the opportunity to read and study Mr. Chesley's submission in support of the settlement. We do not find anything unfair about a procedure which provides interested parties a copy of the proposed settlement, and allows them to make objections before requiring Class Counsel and the Defendants to respond in defense of the proposed settlement.[15] See generally, Herbert B. Newberg, 2 Newberg on Class Actions § 11.55, at 474 (2d ed. 1985) (courts commonly require advance filing of written objections to proposed class action settlements). To hold to the contrary would put Class Counsel and the Defendants in the difficult position of having to anticipate objections in their filings in support of the proposed settlement.

Next, the Green firm maintains that Class Counsel and the Defendants were required to inform all attorneys involved in heart valve litigation about their negotiations concerning the proposed settlement. The law does not require the participation in settlement negotiations of other lawyers representing absent class members. The United States Court of Appeals for the Seventh Circuit has observed that ". . . three-cornered negotiations are clumsy at best . . . ." Mars Steel, 834 F.2d at 684; accord, Gould v. Alleco, Inc., 883 F.2d 281, 285 (4th Cir. 1989), cert. denied, 493 U.S. 1058 (1990). No requirement exists that either Class Counsel or the Defendants must inform other attorneys, such as the Green firm, about their negotiations.

---

[15] As a matter of fact, this is the procedure this Court has always used for class actions.

To rule otherwise would thwart the well-established policy of promoting the settlement of lawsuits. In the matter before this Court, based upon what this Court observed at the fairness hearing, if this Court had required Class Counsel and the Defendants to include in their negotiations all attorneys representing absent class members, the negotiations probably would have deteriorated into a cacophonous clamor of voices. We conjecture that no settlement of any variety would have resulted from such clumsy negotiations.

The Green firm relies on In re Ivan Boesky Sec. Litig., 948 F.2d 1358 (2d Cir. 1991), and In re General Motors Engine Interchange Litig., 594 F.2d 1106 (7th Cir.), cert. denied, Oswald v. Gen. Motors Corp., 444 U.S. 870 (1979), for their argument that Class Counsel and the Defendants should have consulted with them during their negotiations. However, both Boesky and General Motors pertained to the requirement that class counsel consult with counsel for named plaintiffs or other class counsel. Here, the Green firm's clients were not named plaintiffs, nor was the Green firm in any way connected with Class Counsel. Therefore, in light of the case law and the strong policy reasons behind promoting the settlement of disputes, we hold that Class Counsel and the Defendants had no obligation to consult with other attorneys involved with heart valve litigation.

The Green firm finally contends that it was procedurally inappropriate for the settlement to precede class certification. The United States Court of Appeals for the Sixth Circuit, however,

32

has held that a ". . . tentative settlement can precede or be concurrent with class certification." Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO, 808 F.2d 878, 881 (6th Cir. 1986), cert. denied sub nom., Jones v. Clark Equip. Co., 480 U.S. 934 (1987). Allowing settlement to precede class certification promotes early settlement, and therefore reduces attorneys' fees and costs. See In re First Commodity Corp. of Boston Customers Accounts Litig., 119 F.R.D. 301, 306-07 (D. Mass. 1987); Alvarado Partners, L.P. v. Mehta, 723 F. Supp. 540, 545-546 (D. Colo 1989). Therefore, we reject the argument by the Green firm that the proposed settlement is flawed because settlement preceded class certification.

## 3. The Objection that the Anti-Injunction Act Bars Bowling v. Pfizer From Preempting Taylor v. Shiley

The Green firm next argues that this Court may not enjoin a proceeding in a state court. Based upon this reasoning, this Court's decision in Bowling v. Pfizer cannot pre-empt the litigation in Taylor v. Shiley in Pennsylvania state court. The Anti-Injunction Act states:

> [a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect of effectuate its judgments.

28 U.S.C. § 2283 (1992).

33

Another federal district court has considered whether a
federal class action implicates the Anti-Injunction Act. In <u>In re</u>
<u>Washington Pub. Power Supply Sys. Sec. Litig.</u>, 720 F. Supp. 1379
(D. Ariz. 1989), <u>aff'd sub nom.</u>, <u>Class Plaintiffs v. City of</u>
<u>Seattle</u>, 955 F.2d 1268 (9th Cir. 1992), the court stated that:

> [t]he Anti-Injunction Act is no more a barrier
> to the Court's approval of this [settlement]
> than it would be to any other where further
> litigation of claims in related actions
> pending in state courts are circumscribed,
> through collateral estoppel or <u>res judicata</u>,
> as an outcome of settlement. Such effects are
> common. The state court action would not be
> restrained by approval of this Agreement; it
> would be resolved. The Act is simply not
> implicated.

<u>Id.</u> at 1414.

We agree with the reasoning of the <u>Washington</u> court. Approval
of the proposed settlement in <u>Bowling v. Pfizer</u> would not stay
<u>Taylor v. Shiley</u>, the Pennsylvania state court action; rather, as
the Green firm has repeatedly pointed out, this Court's approval
would pre-empt the state court action. Therefore, the Anti-
Injunction Act, 28 U.S.C. § 2283, is not applicable.

**4. The Objection that the <u>Bowling v. Pfizer</u> Class cannot be
Certified Because Rule 23 is not Satisfied**

The Green firm's further argues that even when a court
certifies a settlement class as opposed to a litigation class, all
of the Fed. R. Civ. P. Rule 23 requirements must be met. The Green
firm contends that the proposed class simply does not meet the
requirements of Rule 23.

34

We agree that the proposed settlement must comply with Rule 23; however, courts have recognized that ". . . the requirements of Rule 23 may be more easily satisfied in the settlement context than in the more complex litigation context." In re A.H. Robbins, 85 B.R. 373, 378 (E.D. Va. 1988), aff'd, 880 F.2d 709, 783-40 (4th Cir. 1989); In re Bendectin, 749 F.2d at 305 n.10 (recognizing that courts have held that ". . . the standards for certifying a class are different depending on whether the class is for settlement or whether it is for trial"). The rationale behind the loosening of the requirements is to encourage sweeping settlements of complex disputes.

We now turn to the prerequisites to a class action of Fed. R. Civ. P. 23(a) in the case before this Court. The first requirement, numerosity, is not problematic. To satisfy the numerosity requirement, a plaintiff need not establish that it is impossible to join all members of the proposed class, but only that it would be inconvenient and difficult to do so. Joseph Dennis, Jr. v. The Sawbrook Steel Castings Co., Case No. C-1-89-487, at 2 (S.D. Ohio Feb. 13, 1991) (J. Spiegel). In the case before the Court, somewhere between 50,000 to 100,000 implantees and their spouses comprise the proposed class in Bowling v. Pfizer. Joinder of all members would be impracticable, given the large number of class members. See Basile v. Merrill Lunch, Pierce, Fenner & Smith, 105 F.R.D. 506 (S.D. Ohio 1985) (J. Spiegel) (court considered a class of 275 as large and certified the class). As a result, the numerosity requirement is satisfied.

35

The second requirement of Rule 23(a), common questions of law and fact, has also been demonstrated. This prerequisite is satisfied "'as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation.'" Dennis, Case No. C-1-89-487, at 4 (quoting Sweet v. Gen. Tire & Rubber Co., 74 F.R.D. 333, 335 (N.D. Ohio 1976) (emphasis in original)). We understand that Pfizer-Shiley manufactured the Bjork-Shiley convexo/concave heart valve in a similar manner for all the class members. Facts regarding product liability, negligence, breach of warranty, and fraud would be substantially similar for all class members. Thus, the Defendants' conduct with regard to all implantees arises out of a single nucleus of operative facts and law. See Thompson v. Midwest Found. of Indep. Physicians Ass'n, 117 F.R.D. 108, 112 (S.D. Ohio 1987).

Rule 23(a)'s third requirement is typicality. The United States Court of Appeal for the Sixth Circuit has held that "[t]o be typical, a representatives's claim need not always involve the same facts or law, provided there is a common element of fact or law." Senter v. Gen. Motors Corp., 532 F.2d 511, 525 n.31 (6th Cir. 1976), cert. denied, 429 U.S. 870 (1976). One of the purposes of the typicality requirement is to ensure that the named representatives' claims are similar enough to those of the class to ensure that the named representatives will adequately represent the class. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 157 n.13 (1982); Dennis, Case No. C-1-89-487, at 4.

36

In <u>Mehornay v. Pfizer, Inc.</u>, Case No. CV-91-101-HLH (C.D. Cal. June 3, 1991), another federal district court considered whether to certify a litigation class composed of people implanted with properly functioning Bjork-Shiley convexo/concave heart valves. The <u>Mehornay</u> court denied the motion to certify, finding ". . . insufficient typicality . . . " under Rule 23. <u>Id.</u> at 1. The <u>Mehornay</u> court reasoned as follows:

> [t]ypicality is the major problem for the plaintiff. Since the class consists of people with working heart valves, the extent of emotional distress must range from zero (with implantees who have not heard that there is a problem, or who have heard of the problem but been informed that it is statistically small, or who are so glad to be alive that their joy in life far exceeds their distress) to substantial. With the fraud and deceit claims, the range of what the patients have been told must range form [sic] the full story to nothing at all.

<u>Id.</u> at 2.

We turn first to the argument that because class members' emotional distress differs, the named representatives claims are not typical. This Court has recently considered this issue in another case that is now pending. In <u>David Day v. NLO, Inc.</u>, Case No. C-1-90-67 (S.D. Ohio June 22, 1992) (J. Spiegel), the Court certified a class of workers and frequenters at a uranium processing plant located in Fernald, Ohio. The Court certified a class, reasoning that ". . . the similarity of the plaintiffs' claims, when compared to the differences in the individual plaintiffs' lifestyles and exposure histories, support the Court's ability to achieve efficient and just adjudication of the

plaintiffs' claims." Id. at 7; see also Sterling v. Velsicol Chem. Co., 855 F.2d 1188, 1197 (6th Cir. 1988) (". . . where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy"); Boggs v. Divested Atomic Corp., 141 F.R.D. 58, 65 (S.D. Ohio 1991) (differences in the situation of each class member does not necessarily defeat typicality so long as the harm is of the same type).

Next, we consider the point of the Mehornay court that typicality cannot exist with a fraud claim, because implantees and spouses have received varying amounts of information. While class members probably do have different levels of understanding regarding Pfizer-Shiley's conduct, this does not destroy the formation of a class action. Under the law of the Sixth Circuit, typicality exists when ". . . there is a common element of fact or law." Senter, 532 F.2d at 525 n.31. Although a plaintiff must show justifiable reliance to prove fraud, the focus in a fraud case is usually on the defendant's conduct. Pfizer-Shiley's conduct in manufacturing the Bjork-Shiley convexo/concave heart valve is common for all class members.

Therefore, we hold that the Rule 23 requirement of typicality has been met. We make this decision in light of the fact that the requirements of Rule 23 are more easily satisfied for settlement purposes than for litigation purposes. See e.g., In re A.H.

38

Robbins, 85 B.R. 373, 378 (E.D. Va. 1988), aff'd, 880 F.2d 709, 783-40 (4th Cir. 1989). Thus, while the decision in Mehornay is distinguishable because it dealt with a proposed class action for litigation, to the extent that it is contrary to our decision today, we must disagree with Mehornay.

The final requirement of Rule 23(a) is that the named plaintiffs fairly and adequately protect the interests of the class. In determining the adequacy of class representation, the Sixth Circuit has directed that this Court must examine two factors: (1) whether the named representatives have common interests with the unnamed members of the class; and (2) whether the named representatives will vigorously prosecute the interests of the class through qualified counsel. Senter, 532 F.2d at 525.

The first of these two prongs substantially overlaps with the commonality and typicality requirements. Dennis, Case No. C-1-89-487, at 5. The named representatives in Bowling v. Pfizer have interests in common with the unnamed members of the class. Namely, the named representatives and the class have several common interests: to gain compensation for their emotional distress; to have research conducted to solve the problem of strut fractures in the valves; to have reimbursed explantations where it is scientifically prudent; and to have some sort of compensation in the event of a fracture. Thus, we find that the named representatives have common interests with the unnamed members of the class.

39

Second, we must consider whether the named representatives will vigorously prosecute the proposed class action through qualified counsel. No evidence exists that the named representatives have interests which are antagonistic to the class. See <u>Dennis</u>, Case No. C-1-89-487, at 5. Every indication exists that the named representatives have pursued this litigation diligently against Pfizer-Shiley.

As part of the second prong of Rule 23(a)(4), we also must consider whether the Plaintiffs' lawyer is qualified to serve as Class Counsel. Succinctly, the Green firm alleges that Mr. Chesley is unfit to be Class Counsel. Besides arguing that Mr. Chesley has slighted the interests of the class in favor of a giant fee,[16] the Green firm states that Mr. Chesley does not have suitable qualifications to be Class Counsel. While it is true that Mr. Chesley has not litigated cases involving heart valves before, Mr. Chesley does have substantial experience in class actions and mass torts. See e.g., In re Beverly Hills Fire Litig., Case No. 77-79 (E.D. Ky.); In re Chubb Drought Insur. Litig., Case No. MDL-782 (S.D. Ohio); In re Bendectin, Case No. MDL-486 (S.D. Ohio); In re Agent Orange Prod. Liab. Litig., Case No. MDL-381 (E.D.N.Y.); In re Fernald I Litig., Case No. C-1-85-149 (S.D. Ohio); In re Union Carbide Corp., Gas Plant Disaster at Bhopal, India, Case No. MDL-626 (S.D.N.Y.); In re Air Crash at Detroit, Michigan on August 16, 1987, Case No. MDL-742 (E.D. Mich).

---

[16] We note that this Court has made no decision as to attorneys' fees.

40

The Green firm suggests that Class Counsel should be enlarged to include attorneys who have experience in litigating heart valve cases. The Court understands that Class Counsel has followed this suggestion and has now added as special counsel John T. Johnson, Kasdan & Capretz, as well as other attorneys with substantial experience in heart valve litigation. Therefore, we conclude that Mr. Chesley, along with special counsel, is indeed qualified to serve as Class Counsel. Consequently, this Court holds that the named plaintiffs fairly and adequately protect the interests of the class.

Having met the prerequisites of Rule 23(a), in order to maintain a class action, the Plaintiffs must still satisfy one of the requirements of Rule 23(b). See Dennis, Case No. C-1-89-487, at 6. Under Rule 23(b)(3), a class action is maintainable if common questions of law or fact predominate over any questions affecting only individual members. In the matter before the Court, common questions as to the Defendants actions predominate. The settling of all class members' claims at once, in like fashion, will allow the class to receive maximum benefits without high attorneys' fees and costs, while at the same time avoiding the trauma of going through litigation. Furthermore, in allowing a class action, a certain egalitarian fairness results from treating all persons implanted with the same heart valve alike. Therefore, we conclude that the requirements of Rule 23 of the Federal Rules of Civil Procedure can-- and, indeed, are-- met in Bowling v. Pfizer.

**5. The Objection that the Notice to the Taylor v. Shiley Class was Defective**

The Green firm continues its criticisms by arguing that the notice to the class in Bowling v. Pfizer was improper because it did not inform Pennsylvania implantees about the pending case of Taylor v. Shiley. The notice provided to class members must include enough information to allow the class members to make an informed choice of whether to approve or disapprove the settlement. Weinberger v. Kendrick, 698 F.2d 61, 71 (2d Cir. 1982), cert. denied, Lewy v. Weinberger, 464 U.S. 818 (1983); In re Fed. Skywalk Cases, 97 F.R.D. 365 (W.D. Mo. 1983).

However, while class member are entitled to enough information to allow them to make an informed choice, notice need not include information about a parallel proceeding in a state court. The case in In re Corrugated Container Antitrust Litig., 643 F.2d 195 (5th Cir. 1981), cert. denied, 456 U.S. 998 (1982) is instructive. Corrugated involved a class action settlement of federal price-fixing claims, which extinguished state law price-fixing claims of all class members who did not opt-out. Two objectors, who were class representatives in a certified South Carolina state class action, opposed the federal class action settlement on the ground that South Carolina antitrust law ". . . treats prevailing antitrust plaintiffs more favorably than federal law." Id. at 221. Just as in the case at bar, these objectors contended that ". . . the notice should have included space for them to explain the

purported advantages to South Carolina plaintiffs of pursuing the state-law claims." Id. at 224.

The United States Court of Appeals for the Fifth Circuit rejected the objectors' argument, reasoning that if the objectors' state law contentions had been included in the notice, ". . . the district court then would have been bound to allow the proponents to respond." Id. Such an unwieldy procedure would have undermined the purpose of the notice of informing class members enough to allow them to make an informed choice about the proposed settlement. The Corrugated court reasoned that ". . . [i]nclusion of the objections and responses would have made the notice's neutrality difficult to maintain and may have become so detailed that the notice would 'confuse class members and impermissibly encumber their rights to benefit from the action.'" Id. (quoting In re Nissan Antitrust Litig., 552 F.2d 1088, 1105 (5th Cir. 1977). As a result, the Corrugated court concluded that the notice of the federal court was sufficient, despite its failure to include notice of the pending state class action. Id. We agree and adopt the reasoning of the Corrugated court in rejecting the Green firm's argument concerning deficient notice.

**6. The Objection that a Separate Pennsylvania Sub-Class Should be Formed in Bowling v. Pfizer**

Both in their filings and in court, the Green firm has stated that a separate sub-class should be formed for implantees from Pennsylvania. The United States Court of Appeals for the Sixth

Circuit has recognized, however, that ". . . subclassing often leads to more complex and protracted litigation . . . ." Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO, 803 F.2d 878, 880 (6th Cir. 1986), cert. denied sub nom., Jones v. Clark Equip. Co., 480 U.S. 934 (1987). The Green firm has failed to articulate any rational reason for arguing that this Court should carve out a Pennsylvania sub-class. Given the decision in Brinkman v. Shiley, Inc., 732 F Supp. 33, 34, aff'd, 902 F.2d 1558 (3d Cir. 1989), the law in Pennsylvania looks no more favorable than in any other state. Therefore, "[n]o purpose would . . . [be] served by appointing counsel for a subclass of disappointed claimants except to increase expenses to the class and delay proceedings." In re Agent Orange Prod. Liab. Litig., 597 F. Supp 740, 757 (E.D.N.Y. 1984), aff'd in part, rev'd in part on other grounds, 818 F.2d 226 (2d Cir. 1987). Consequently, we find this argument of the Green firm to be specious.

## 7. The Objection that Class Counsel Has Conducted Inadequate Discovery to Properly Settle Bowling v. Pfizer

In the matter before the Court, Class Counsel has admitted that only nominal discovery was taken before the settlement of the case. Of course, voluminous information about the Bjork-Shiley convexo/concave valve is available to the public.

The amount of discovery conducted is a factor in considering the fairness of a proposed settlement, but it is not a dispositive factor. We can imagine an inadequate settlement with much

44

discovery done; similarly, we can envision an outstanding settlement with little discovery done. If a court required a certain amount of discovery to be taken, the primary beneficiary of such a per se rule would be the attorneys. Therefore, we conclude that it would be unwise to set a minimum amount of discovery that must be conducted before a settlement is approved.

Furthermore, Mr. Chesley had access to public information available about the Defendants' alleged misconduct. "To adequately represent the class, counsel must demonstrate access to sufficient 'information regarding the facts of their case'; where that information exists, 'we are not compelled to hold that formal discovery was a necessary ticket to the bargaining table.'" Handschu v. Special Serv. Div., 605 F. Supp. 1384, 1394 (S.D.N.Y. 1985), aff'd, 787 F.2d 828 (2d Cir. 1986), (quoting In re Corrugated Container Antitrust Litig., 643 F.2d 195, 211 (5th Cir. 1981), cert. denied, 456 U.S. 998 (1982)). Thus, a fair and reasonable settlement may be negotiated where the plaintiffs had access to discovery in other cases and the results of government investigations prior to agreeing to the class settlement. In re Chicken Antitrust Litig. Am. Poultry, 669 F.2d 228, 241 (5th Cir. 1982); In re Baldwin-United Corp., 105 F.R.D. 475, 483 (S.D.N.Y. (1984).

## 8. The Objection that the Proposed Settlement Provides Inadequate Compensation

A central argument of the Green firm is that the proposed settlement provides inadequate monetary compensation to class members. Specifically, the Green firm contends that the Medical Consultation Fund, which gives each class member approximately $2500 to $4000, is insufficient. The Green firm states that a fair settlement would provide each class member at least $10,000.

Essentially, the Green firm's argument centers around the key factor this Court must examine-- the strength of the Plaintiffs' case if this matter were fully litigated compared with the relief offered by the proposed settlement. See Carson v. Am. Brands, 450 U.S. 79, 88 n.14 (1981); Williams v. Vukovich, 720 F.2d 909, 922 (6th Cir. 1983); Bronson v. Bd. of Educ. of the City Sch. Dist. of Cincinnati, 604 F.Supp. 68, 73 (S.D. Ohio 1984; In re Agent Orange Prod. Liab. Litig., 597 F. Supp. 740, 762 (E.D.N.Y. 1984), aff'd in part., rev'd in part on other grounds, 818 F.2d 226 (2d Cir. 1987) (the most important consideration in evaluating a proposed settlement is ". . . the strength of [the] plaintiffs' case on the merits weighed against he amount offered in settlement. . . .").

Thus, we now turn to the question of the strength of the Plaintiff class' case. The Green firm centers its argument around our parent court's decision in In re Bendectin Litig., 857 F.2d 290 (6th Cir. 1988), cert. denied, Hoffman v. Merrell Dow Pharmaceuticals, Inc., 485 U.S. 1006 (1989). According to the

Green firm, Bendectin established that in products liability cases, Ohio's choice of law rules require a case to be litigated in accordance with the law where the product was manufactured. The Green firm continues that because the Bjork-Shiley convexo-concave valve was manufactured in California, that this Court should apply the law of California to the Bowling v. Pfizer case.

The Green firm reasons that the decision in Khan v. Shiley, 217 Cal. App. 3d 848, 266 Cal. Rptr. 106 (4th Dist. 1990), review denied, (May 3, 1990), is the determinative law in California, and that therefore, the plaintiff class in Bowling v. Pfizer has a high chance of success on the merits. The Green firm concludes that given the Plaintiff class' high likelihood of recovering large compensatory and punitive damages from Pfizer-Shiley, the proposed settlement provides paltry remuneration to class members.

In considering the argument set forth by the Green firm, we find that the Green firm has vastly over-stated the strength of the Plaintiff's case. We first note that despite years of litigation, no court has ever awarded a judgment in favor of a plaintiff with a properly functioning heart valve. While one court did allow a claim against Pfizer-Shiley to proceed past the summary judgment stage, approximately twenty-seven courts have not. These twenty-seven courts have granted summary judgment to Pfizer-Shiley when the plaintiff has sued over his or her properly functioning heart valve. See e.g., Sill v. Shiley, Inc., 909 F.2d 508 (8th Cir. 1990); Pryor v. Shiley, Inc., Case No. 89-35549 (9th Cir. Oct. 18, 1990); Hagepanos v. Shiley, Inc., Case No. 87-3141 (4th Cir.

47

April 18, 1988); <u>Lauterbach v. Shiley, Inc.</u>, Case No. H-87-3208 (S.D. Tex. March 29, 1991).

Even in the Green firm's home state of Pennsylvania, the United States Court of Appeals for the Third Circuit upheld a district court's decision that under Pennsylvania law ". . . there can be no recovery for emotional distress absent attending physical injury." <u>Brinkman v. Shiley, Inc.</u>, 732 F Supp. 33, 34, <u>aff'd</u>, 902 F.2d 1558 (3d Cir. 1989); <u>accord</u>, <u>Creager v. Shiley, Inc.</u>, Case No. 87-1221 (W.D. Pa. Feb. 12, 1991).

Nevertheless, the Green firm points to the decision in <u>Khan v. Shiley</u>, 217 Cal. App. 3d 848, 266 Cal. Rptr. 106, as the critical case for the Plaintiffs. In <u>Khan</u>, an implantee with a properly functioning heart valve sued Pfizer-Shiley, alleging a wide variety of causes of action. Defendants Pfizer-Shiley filed a motion for summary judgment, as it had in other cases involving a working heart valve. The <u>Khan</u> court granted the Defendants' motion for summary judgment on the plaintiffs claims involving products liability. The <u>Khan</u> court, however, allowed the plaintiff to proceed with its cause of action based upon fraud. In conclusion, the <u>Khan</u> court stated that:

> [o]ur decision neither establishes a new cause of action nor drastically extends existing law. It merely confirms that a manufacturer of a product may be liable for fraud when it conceals material product information from potential users. This is true whether the product is a mechanical heart valve or frozen yogurt.

<u>Id.</u> at 858, 266 Cal. Rptr. at 112.

We disagree with the analysis of the Green firm that In re Bendectin mandates that Khan is the controlling law which this Court must apply to Bowling v. Pfizer, the matter now before this Court. We agree that this Court must apply Ohio's choice of law principles in determining which state's law is applicable. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). In tort actions, Ohio law requires that a court should apply the law of the state with the most significant relationship to the lawsuit. Bendectin, 857 F.2d at 304; Morgan v. Biro Mfg. Co., 15 Ohio St. 3d 339, 474 N.E.2d 286 (1984).

In Morgan, the Ohio Supreme Court ruled that Kentucky law governed the claim of a person injured by a meat grinder in Kentucky, even though the meat grinder was manufactured in Ohio by an Ohio corporation. Morgan, 15 Ohio St. 3d 339, 474 N.E.2d 286; see also Lawson v. Valve-Trol Co., 1991 WL 19312 (Ohio Ct. App. Feb. 13, 1991) (applying Indiana law where a machine part manufactured in Ohio injured a person in Indiana). In Bendectin, the court applied the law prescribed in Morgan, but reached a seemingly different result. Briefly, Bendectin involved a products liability action by children of mothers who had taken the Bendectin drug for morning sickness. These children claimed that their mothers' ingestion of the drug Bendectin had caused their birth defects. Bendectin, 857 F.2d at 290.

The Bendectin court determined that Ohio's law should govern, because Ohio was where the defendants had manufactured the Bendectin drug. In essence, the court determined that Ohio had the

49

greatest relationship to the lawsuit. While recognizing that the respective home states of the plaintiffs had an interest in the resolution of the litigation, the court determined that, unlike Morgan, ". . . the state of domicile may at the time of suit may bear little or no relation to where a mother may have taken a morning sickness drug years before." Id. at 305. Thus, the Bendectin court applied the law of the state of manufacture, which was Ohio.

The litigation in the case before the Court resembles Morgan more closely than it does Bendectin; therefore, the law of the place of injury should control. In Bendectin, the court applied the law of the state of manufacture, in part, because of the long time lag between the ingestion of the drug, and the filing of the lawsuit. Furthermore, in Bendectin, it was often unknown in what state the plaintiffs' mothers had ingested the drug.

In contrast, these same concerns are not present in case now before this Court. The Bjork-Shiley convexo/concave valves were implanted in class members generally less than thirteen years ago.[17] Presumably, records still exist as to where each of the class members was implanted with the valve.[18] Thus, this Court finds that the state with the most significant relationship to

---

[17] Pfizer-Shiley distributed the Bjork-Shiley convexo/concave heart valve from 1979 until 1986.

[18] Even if records are not available, the plaintiffs in Bowling v. Pfizer are more likely to remember where they went through heart surgery to receive an artificial heart valve, than the plaintiffs in Bendectin would remember, or even know, where their mothers ingested a morning sickness drug.

50

Bowling v. Pfizer is the state where the injury occurred, just as in Morgan.[19] California law is only applicable to those class members who were allegedly injured in California. Therefore, with regard to the class as a whole, Khan is of limited value.

Assuming, arguendo, that Khan is the controlling law for the class in Bowling v. Pfizer, the Plaintiff class still would have tall hurdles to mount to actually prevail at trial. In order to prevail at trial the Plaintiffs under Khan would have to prove five elements: (1) misrepresentation; (2) knowledge of the falsity; (3) intent to defraud to induce reliance; (4) justifiable reliance; and (5) damages. Id. at 857. Fraud is a relatively difficult tort to prove at trial, because the defendant's negligence is not sufficient. Instead, a plaintiff must still prove knowledge and intent to defraud by Pfizer-Shiley. In addition, a plaintiff must demonstrate that his physician detrimentally relied upon the Defendants' fraudulent information. The fact that information

---

[19] It seems particularly inappropriate to apply California law to the proposed class as the Green firm maintains, in light of the fact that California has refused to apply its law to certain out-of-state plaintiffs. See Stangvik v. Shiley, Inc., 54 Cal. 3d 744, 1 Cal. Rptr. 2d 556, 819 P.2d 14 (1991) (stayed actions by foreign implantees in California even though the valve was manufactured in California because California's interest in deterring wrongful conduct was not sufficient to keep the case); see generally, Paulo v. Bepex Corp., 792 F.2d 894, 896 (9th Cir. 1986) (Ontario law applied where plaintiff was injured in Ontario by a meat grinder manufactured in California because California had ". . . little interest in applying its law to compensate citizens of Ontario."); Continental Casualty Co. v. Fiberboard, 762 F. Supp. 1368, 1377 (N.D. Cal. 1991), aff'd, 953 F.2d 953 F.2d 1386 (9th Cir. 1992) (Texas punitive damages law applied where plaintiff was injured in Texas by asbestos because ". . . California has no interest in extending into other states California policies designed to protect the public").

51

concerning the fracture rates of the Bjork-Shiley convexo/concave
valve was available in the medical literature would further
complicate a plaintiff's case. See Brooks v. Medtronic, Inc., 750
F.2d 1227, 1230-31 (4th Cir. 1984) (refusing to impose liability
for defective pace maker because under the learned intermediary
doctrine, the doctor could have selected a less risky alternative).

Moreover, many members of the proposed settlement class may
also face time-bar obstacles. Over the past few years, there has
been widespread publicity concerning the risk of fracture with the
Bjork-Shiley convexo/concave heart valves. Because of the passage
of time, the claims of many class members may be time barred, even
if they had a valid cause of action under Khan. See In re Agent
Orange Prod. Liab. Litig., 818 F.2d 145, 173 (2d Cir. 1987)
(approving a settlement partially in light of the fact that some
plaintiffs may have been time barred). Thus, various state
statutes of limitation and statutes of repose may be applicable to
certain class members in Bowling v. Pfizer.

Furthermore, assuming Khan to be the applicable law, the
plaintiff class would also face other difficulties before gaining
a judgment. Many states require a plaintiff to show physical harm
before allowing recovery for emotional distress. See generally,
Restatement (Second) of Torts §§ 388, 395, 398, 402(A), 402(B)
(1965). Furthermore, under most state law, a plaintiff must show
that he has suffered a severe injury before the Court will allow
recovery for emotional distress. See e.g., Igo v. Coachman Indus.,

Inc., 938 F.2d 650, 656 (6th Cir. 1991); Lee v. Bank of Amer., 218
Cal. App. 3d 914, 267 Cal. Rptr. 387, 390 (2d Dist. 1990).

In response, the Green firm contends that even if the decision
in Khan is not controlling, most American jurisdictions would
recognize the plaintiff class' claims as stating a valid cause of
action. In support of this proposition, the Green firm argues that
Pfizer has only obtained summary judgment in eleven jurisdictions,
and then cites to an appendix of cases to support its proposition
that the Plaintiff class could survive the Defendants' motion for
summary judgment.

This Court is not at all persuaded by this argument by the
Green firm.    Eleven jurisdictions agree that implantees with
working valves are not entitled to a day in court.    When eleven
jurisdictions (not one or two) agree on a particular result, the
victor in these eleven courts probably has compelling arguments.
These arguments include the potential chilling effect on the
development of new products if people could sue for their concern
about a possible product failure.    See Hagepanos v. Shiley, Inc.,
Case No. 87-3141 at 5 (4th Cir. April 1985) (if implantees with
working valves can sue ". . . the implications for the future
safety and the future development of health care [would be]
profound"); see also Willett v. Baxter Int'l, Inc., 929 F.2d 1094,
1100 n.20 (if all product users who learn about a small percentage
of malfunctions can sue for their anxiety, then there is no cost-
spreading of an individual's loss); Obrien v. Medtronic, Inc., 149
Wis. 2d 615, 439 N.W.2d 151 (Wis. Ct. App. 1989) (allowing

53

implantees with working valves to sue could lead down a slippery slope and discourage companies from informing the public about problems with its products). In light of these arguments and the numerous courts and jurisdictions which have granted summary judgment, we find that the Plaintiff class has little chance of success if this case were tried on its merits.

Finally, we should also note the staggering costs of litigating the complex issue of whether Pfizer-Shiley should be held liable for the Bjork-Shiley convexo/concave heart valve. Throughout these proceedings, Pfizer-Shiley has denied liability. Under a fraud count, a plaintiff would have to prove that Pfizer-Shiley intended to defraud implantees, as discussed above. If a plaintiff chose to pursue an allegation based upon products liability, the plaintiff would have to prove that the Bjork-Shiley convexo/concave valve was in a ". . . defective condition [and] unreasonably dangerous." Restatement (Second) of Torts § 402A; W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 99, at 695 (5th ed. 1984). Based upon this argument, a plaintiff would have to show that the Shiley valves were more dangerous than any of the other heart valves available. See John J. Collins, Jr., The Evolution of Artificial Heart Valves, 325 New Eng. J. Med. 624, 626 (Feb. 28, 1991) (recognizing that every model of heart valve has

54

suffered some mechanical failures).[20]  Either of these theories of liability would involve extensive discovery.[21]

Therefore, this Court concludes that the proposed settlement provides fair compensation, because of the Plaintiff class' slim chance of winning at trial and the high costs of litigating this matter.  Although the amount to be distributed to implantees of the Bjork-Shiley convexo/concave heart valve cannot yet be determined, Class Counsel and the attorneys for the Defendants have estimated that each implantee will receive somewhere between $2500 and $4000.[22]

---

[20]  Dr. Collins makes this alarming conclusion to his article:

> [g]ood valves have been succeeded by better valves, and the succession will continue unless the industry is so punished by the press and professional critics that innovation is stifled and the risk of failure becomes too great to continue.  When that occurs, yet another form of technology pioneered and developed in the United States will disappear from these shores.

Collins, The Evolution of Artificial Heart Valves, 324 **New Eng. J. Med.** at 626.

[21]  Moreover, the value to individual class members' of their claims would be reduced by attorney's fees and costs, generally ranging between 30-40% of any settlement or judgment.

[22]  The exact amount will be firmed up when more class members are identified and expenses and attorney's fees are approved by this Court.  See In re Drexel Burnham Lambert Group, Inc., 130 B.R. 910, 925 (S.D.N.Y. 1991), aff'd, 960 F.2d 285 (2d Cir. 1992) (a settlement may be approved even though ". . . the actual amounts to be distributed to the Class members will be subject to further allocation procedures . . ."); In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 170 (2d Cir. 1987) (there is ". . . no absolute requirement that . . . a [distribution] plan be formulated prior to notification of the class").

55

## 9. The Objection that the Proposed Settlement's Other Funds are Insufficient and Flawed

The Green firm's next set of arguments involve the various funds in the proposed settlement. In the event of fracture, implantees or their estates have the right to sue, proceed to arbitration, or receive certain set amounts according to the Fracture Compensation Mechanism. For implantees from the United States, these set amounts range from $500,000 to $2,000,000. The amounts offered to implantees and their spouses are reasonable, based upon this Court's experience with personal injury cases. More importantly, if these set amounts are unreasonable, an implantee or her estate can retain an attorney and sue for greater damages. Thus, the proposed settlement appears to this Court to be very favorable to class members, given the number of options that class members retain.

The Green firm also quarrels with the Research Fund. The thrust of the Green firm's argument is that Pfizer has not sufficiently funded the Research Fund. The Research Fund is designed to determine the best remedies for dealing with the Bjork-Shiley convexo/concave heart valve. The Green firm contends that Pfizer-Shiley is the only party who will benefit from this Fund.[23] We disagree. The primary beneficiaries of this fund are the class members of the proposed settlement.

---

[23] The Court is unaware of how Pfizer-Shiley will benefit from this Patient Benefit Fund, as Pfizer-Shiley has declined any proprietary interest over any discoveries that may result from the research supported by this Fund.

The Green firm then claims that Pfizer-Shiley would have made the contribution to research regardless of the <u>Bowling v. Pfizer</u> settlement. The Green firm gives no evidence to support this assertion. Nevertheless, we do know that under the proposed settlement the Defendants are legally bound to provide the research funds.

In further criticism of the Research fund, the Green firm argues that the proposed settlement is deficient because it gives the Supervisory Panel discretion to spend less than $37.5 million in research. While the Supervisory Panel does have power to allocate its funds in the manner it finds most effective for the benefit of the class, in no event may the research money revert to Pfizer-Shiley. Therefore, this Court is confident that the research money will be spent for the benefit of the class.

The next argument of the Green firm is that Pfizer-Shiley should have no say in the selection of the two Supervisory Panels. Under the proposed settlement, this Court has the power to appoint members to both Supervisory Panels. Class Counsel and Pfizer-Shiley only have the opportunity to make suggestions to this Court. This Court plans to vigorously undertake its responsibility for appointing members to the Supervisory Panels.

The Green firm further argues that the decision to have explant surgery should be made solely by the patient and his physician. According to the proposed settlement, the Supervisory Panel is going to issue objective guidelines as to which implantees are entitled to reimbursed explantations. Nothing in the proposed

57

settlement interferes with an implantee's decision to have an explantation; rather, the only question is which explantations will be reimbursed. Moreover, implantees who do not receive a reimbursed explantation, but believe that they are entitled to one still retain the right to sue Pfizer-Shiley.

This Court understands that the Supervisory Panel is going to recommend explantations in those situations in which it is more dangerous to keep the heart valve in place than it is to have an explantation. In making these recommendations, the Supervisory Panel will rely solely upon objective evidence. These explantations, based upon scientific evidence, will be approved. This Court finds that the proposed settlement is fair in its provision refusing to reimburse explantations when they are medically ill-advised.

The Green firm finally argues that the settlement provision allowing a class member to arbitrate in the event of fracture is deficient. The proposed settlement provides that all arbitrations shall be conducted in accordance with the rules of the American Arbitration Association. Proposed Settlement, § 7.4 at 27. This Court cannot anticipate problems that may arise in the course of arbitrations. However, this Court has confidence in the rules promulgated by the American Arbitration Association. Any problems that do occur will be handled just as in any other arbitration. Furthermore, if a class member is concerned that an arbitration may not yield a fair result, that class member can sue or opt for a

58

pre-determined amount of compensation under the Fracture
Compensation Mechanism.

### Public Citizen's Objections

**1. The Objection that this Court Lacks Diversity Jurisdiction Over
the Class**

Public Citizen's first argument is that this case should be
dismissed because each of the plaintiffs fails to meet the minimum
jurisdictional amount of $50,000 as required with diversity
jurisdiction. See 28 U.S.C. § 1332. In a class action for which
certification is sought under Fed. R. Civ. P. 23(b)(3), the claims
of all class members must exceed $50,000. See Zahn v. Int'l Paper
Co., 414 U.S. 291 (1973) (requiring all class members' claims to
exceed the jurisdictional limit, which Congress has since increased
to $50,000); Amen v. City of Dearborn, 532 F.2d 554, 559 (6th Cir.
1976).

In considering the requisite jurisdictional amount for proper
diversity jurisdiction, courts have required a plaintiff to
demonstrate that her jurisdictional allegations have been made in
good faith. St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S.
283, 288-289 (1938). Once a plaintiff has demonstrated good faith,
"[i]t must appear to a legal certainty that the claim is really for
less than the jurisdictional amount to justify dismissal." Id.;
Klepper v. First Am. Bank, 916 F.2d 337, 340 (6th Cir. 1990) ("the
amount alleged in the complaint will suffice unless it appears to

a legal certainty that the plaintiff in good faith cannot claim the jurisdictional amount").

In the case before the Court, the Plaintiffs have met the good faith test. Although it is unlikely that the Plaintiffs would have made it to trial and then prevailed, had they done so, the Plaintiffs can assert in good faith that they would have received more than $50,000 each from a jury. See also Klepper, 916 F.2d at 341 (a plaintiff's punitive damage claim can be considered in computing the jurisdictional amount).

Public Citizen fails to recognize in its argument that the amount of a settlement is often less than the amount the plaintiff expects to receive if he or she prevails at trial. A settlement offer is discounted by the risks of losing at trial. See Williams v. Vukovich, 720 F.2d 909, 922 (recognizing that settlement amounts are discounted by the risks of litigation). In the case before the Court, the settlement amount has been reduced to a payment of $2500 to $4000 (not counting the other substantial benefits gained by the class), because of the Plaintiffs' slim likelihood of obtaining a judgment. Therefore, we hold that diversity jurisdiction exists, because we cannot say to a legal certainty that the class members do not each have a claim for $50,000.

**2. The Objection that the Proposed Settlement Unfairly Discriminates Against Non-Ohio Class Members**

Public Citizen's next argument is that the proposed settlement attempts to bind all class members to Ohio law, which is

impermissible under <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797 (1985). In <u>Shutts</u>, a Kansas state court attempted to bind absent class members on a nationwide basis to a judgment based upon Kansas law. The United States Supreme Court in <u>Shutts</u> overruled the Kansas state court and held that because most of the class members had little or no contact with the state of Kansas, and had significant contacts with other jurisdictions where the law might be substantially different, the Kansas court could not, as a matter of federal due process, apply Kansas law to a nationwide class. <u>Id.</u> at 822.

However, the situation in <u>Shutts</u> is quite different than in the case now before this Court. This Court has made no ruling on the merits of the Plaintiffs' claims under the substantive law of Ohio.[24] Instead, this Court has considered whether the proposed settlement is fair, adequate, and reasonable under the guidelines established in Fed. R. Civ. P. 23. Moreover, to accept Public Citizen's argument that this Court cannot determine whether the proposed settlement is fair, adequate, and reasonable would effectively preclude courts from settling any diversity class actions involving plaintiffs from multiple jurisdictions. Therefore, we hold that the proposed settlement does not unfairly discriminate against non-Ohio class members.

---

[24] The only Ohio law this Court has relied upon is the <u>Klaxon</u> requirement that this Court, sitting in Ohio, apply Ohio law to determine which law governs the case.

61

### 3. The Objection that Amounts for Medical Consultation and Psychological Counseling Are Inadequate

This point has already been addressed above in considering the arguments of the Green firm, in which the Plaintiffs' likelihood of success on the merits was compared with the relief offered in the proposed settlement.

### 4. The Objection that Plaintiffs' Counsel Premised the Settlement on Substantive Law Unfavorable to a Large Portion of the Class

As discussed above, the proposed settlement is not based upon Ohio law, but rather the dictates of Fed. R. Civ. P. 23. Public Citizen argues that this class action should have been filed in California where _Khan_ would have applied, and the class would have been entitled to greater compensation. We do not find this argument persuasive. California courts have shown no over-riding interest in applying its law to non-Californians. See Stangvik v. Shiley, Inc., 54 Cal. 3d 744, 819 P.2d 14 (1991) (sent foreign plaintiffs' cases against Shiley back to their home countries to be tried); see generally, Paulo v. Bepex Corp., 792 F.2d 894, 896 (9th Cir. 1986) (Ontario law applied where plaintiff was injured in Ontario by a meat grinder manufactured in California because California had ". . . little interest in applying its law . . ." to others); Continental Casualty Co. v. Fiberboard, 762 F. Supp. 1368, 1377 (N.D. Cal. 1991), aff'd, 953 F.2d 953 F.2d 1386 (9th Cir. 1992) (Texas punitive damages law applied where plaintiff was

62

injured in Texas by asbestos because ". . . California has no interest in extending into other states California policies designed to protect the public").     Moreover, Public Citizen presumes in its argument that this Court is basing its decision on Ohio law.  As discussed previously, however, this Court is not analyzing the terms of the proposed settlement under Ohio law. Therefore, we find that Class Counsel did not premise the proposed settlement on unfavorable law.


**5.  The Objection that Non-U.S. Class Members are Treated Unfairly**


Public Citizen next argues that the payment to foreigners in the event of a fracture is unfair.  We assume that this objection is moot, as all the foreign objectors withdrew their objections after Class Counsel and the Defendants altered the proposed settlement in response to the arguments by foreign Objectors. Furthermore, Public Citizen failed to raise this argument at the continuation of the fairness hearing on July 22, 1992, which followed the changes made to the proposed settlement, concerning compensation to foreigners.


**6.  The Objection that the Procedures and Payments for Valve Replacement Surgery are Unfair**


Public Citizen's sixth argument is that the procedures and payments for valve replacement surgery under the proposed

settlement are unfair. This argument can be broken down into several smaller contentions.

First, the composition of the Supervisory Panels is criticized by Public Citizen. We reiterate that this Court is the only entity empowered to appoint members of the Supervisory Panels. Class Counsel and the Defendants only have the right to propose certain members to this Court.

Second, Public Citizen argues that the proposed settlement is flawed because it does not fully cover the costs of valve replacement surgery. Public Citizen notes that Pfizer-Shiley is only obliged to pay for post-operative medical care within a "reasonable period" after the explantation. While it might be advantageous to the class to have certain features added to the proposed settlement, we recognize that the proposed settlement is just that, a settlement. It is not a wish-list of class members that the Defendants must fulfill. A settlement should be the end result of negotiation between two parties with conflicting interests. While the proposed settlement might be improved for the class with certain additions, in examining the proposed settlement as a whole, the proposed settlement does not become unfair because post-operative care is limited to a reasonable period after the explantation.

Public Citizen continues its list of criticisms with the proposed settlement's procedures for reimbursement of travel expenses incurred as a result of an explantation. Public Citizen argues that class members who reside far from excellent

64

cardiovascular surgery facilities are at a disadvantage. We do not deny this criticism. Class members, or anyone else for that matter, who resides far away from excellent hospitals may be in jeopardy in a health emergency. However, no proposed settlement cannot remedy this fact. The proposed settlement does entitle class members who qualify for reimbursed explantations with $38,000 to cover all miscellaneous costs and expenses with regard to hospitalization, including travel and lodging expenses.[25] Thus once again, while the proposed settlement may not provide everything that class members may desire, given that it is a settlement, it does provide numerous benefits to class members.

## 7. The Objection that the 70-degree Valve Class Members Have No Class Representative

Public Citizen next argues that the proposed settlement is unfair, because the 70-degree valve class members do not have a class representative. According to what has been represented to this Court, the 70-degree valves have about a 1% higher rate of fracture than do the 60-degree valves. Public Citizen argues that 70-degree implantees are prejudiced by the proposed settlement because the proposed settlement does not take into account the higher fracture rate of the 70-degree valves.

---

[25] In addition, class members who qualify for reimbursed explantations are entitled to up to $1500 per week for one year for lost wages.

65

We disagree. Importantly, in the event of fracture, all class members retain the right to litigate or to arbitrate. Therefore, if Pfizer-Shiley does not provide implantees with 70-degree valves or their estates with sufficient compensation, the implantees or their estates may sue. Furthermore, this Court is aware of no evidence that implantees with 70-degree valves suffer greater emotional distress than implantees with 60-degree valves. Given that an implantee faces the possibility of death every day due to a strut fracture, we rather doubt that an implantee's emotional distress is heightened much by an increased risk of a strut fracture of approximately 1 per cent.[26] See generally, Richard Zeckhauser and W. Kip Viscusi, Risk Within Reason 248 **Science and Technology** 559 (May 1990) ("[d]ecisions involving risks illustrate the limits of human rationality . . . [w]e overreact to some risks and virtually ignore others"). Peter Huber, Safety and the Second Best: The Hazards of Public Risk Management in the Courts, 85 **Colum. L. Rev.** 277 (1985) (noting that people are often irrational in analyzing health risks).

---

[26] According to one study, the annual risk of fracture is 0.025% and .26% for 60-degree aortic and mitral valves, respectively, and .55 and 1.9% for 70-degree aortic valves and mitral valves, accordingly. Yolanda Van Der Graff et al., Risk of Strut Fracture of Bjork-Shiley Valves, 339 **The Lancet** at 257-261 (Feb. 1, 1992).

66

**8. The Objection that the Proposed Settlement Treats a Spouse's Claims Unfairly**

Public Citizen's final criticism is that the claims of spouses of implantees of the Bjork-Shiley convexo/concave valve are extinguished without those spouses receiving anything in return. Since Public Citizen made this criticism, the proposed settlement has included a $10 million fund to be divided equally among all spouses of implantees. The amount of payment to each spouse will depend upon the number of spouses who can be identified. Because of the changes to the proposed settlement and the failure to reiterate this criticism specifically at the July 22, 1992 fairness hearing, we believe that this contention by Public Citizen is now moot.

## CONCLUSION

This Court has attempted to examine each of the criticisms challenging the proposed settlement. We have found each of these arguments to be unpersuasive. Furthermore, when we examine the proposed settlement holistically, we become further convinced that it is beneficial to the proposed class.

First of all, any class member who did not want to be a part of the proposed settlement had the chance to opt out. See Alaniz v. Calif. Processors, Inc., 73 F.R.D. 269, 276-277 (N.D. Cal. 1976) (an opt out procedure strengthens the overall reasonableness of

67

the settlement). Relatively few class members in the case now before this Court availed themselves of this option.

Second, under the proposed settlement class members retain most of their rights. Class members have only given up their right to sue for the emotional distress arising out of the fear that a properly functioning heart valve may fracture. As discussed above, this is an extremely speculative claim. The fact of the matter is no one has ever successfully litigated a claim involving a properly functioning heart valve. Moreover, it is a claim that has a high-price for class members-- any such litigation would involve many hours for both the attorneys and the expert witnesses.

In exchange for relinquishing their claim for emotional distress, class members receive a variety of benefits. All identified class members are guaranteed a payment of somewhere between $2500 to $4000 for medical or psychological consultation. In addition, a Supervisory Panel will oversee research designed to: (1) determine which implantees who may have a significant fracture risk; and (2) discover methods to reduce the risks facing implantees. Under the proposed settlement, any implantees who scientifically merit an explantation will be reimbursed for most, if not all, of their costs. Finally, any implantee who suffers a fracture is guaranteed a certain payment from the Fracture Compensation Fund, ranging from $500,000 to $2 million for United States citizens.

Other than ceding their claim for emotional distress over a properly functioning valve, class members retain their rights.

68

They may sue Pfizer-Shiley for the costs of an explantation, if the Supervisory Panel does not approve their application for a reimbursed explantation based upon objective data. If a valve ever fractures, class members have three options: (1) sue, in which case Pfizer-Shiley retains all defenses; (2) arbitrate, in which case Pfizer-Shiley waives all defenses; or (3) accept the guaranteed payment under the Fracture Compensation Mechanism. Thus, class members not only receive numerous benefits, but also keep most of their rights.

Therefore, in light of all these factors, we conclude that the proponents of the proposed settlement have met their burden. Under a high level of scrutiny exercised by this Court, Class Counsel and the Defendants have amply demonstrated that the proposed settlement is fair, adequate, and reasonable. Simply put, the settlement we now approve is a good deal for class members. Accordingly, this Court approves the settlement of this matter under Fed. R. Civ. P. 23(e).

The Court will hold a status conference in this case on September 9, 1992 at 3:30 p.m. concerning the implementation of the proposed settlement.

SO ORDERED.

Dated: *August 19, 1992*

S. Arthur Spiegel
United States District Judge